# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARMAINE GINLEY, | ) | CASE NO. 1:17CV00841 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Charmaine Ginley, ("Plaintiff" or "Ginley"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for a Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, *et seq.* ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends the Commissioner's final decision be VACATED and the case REMANDED for

further proceedings consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

## I.    PROCEDURAL HISTORY

In October 2013, Ginley filed an application for POD and DIB alleging a disability onset date of June 1, 2012, and claiming she was disabled due to mixed connective tissue disease, loss of consciousness, syncope, joint pain, anxiety, lower back issues, and depression.  (Transcript ("Tr.") 142, 187.)  The applications were denied initially and upon reconsideration, and Ginley requested a hearing before an administrative law judge ("ALJ").  (Tr. 102, 107, 110.)

On October 9, 2015, an ALJ held a hearing, during which Ginley, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 27-69.)  On November 10, 2015, the ALJ issued a written decision finding Ginley was not disabled from her alleged onset date of June 1, 2012 to March 23, 2015, but was disabled from March 24, 2015 through the date of the decision.  (Tr. 12-22.)  The ALJ' s decision became final on February 17, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On April 19, 2017, Ginley filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15.) Ginley asserts the following assignment of error:

(1) The Administrative Law Judge ("ALJ") erred in finding the plaintiff not disabled at step five of the sequential evaluation.

(Doc. No. 13 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Ginley was born in March 1960 and was 52 years-old at the time of her alleged disability onset date, making her an individual closely approaching advanced age under social security regulations.  At the time of her administrative hearing, she was 55 years-old, making her an

2

individual of advanced age under social security regulations.  (Tr. 20, 142.)  *See* 20 C.F.R. §§ 404.1563(d), (e).  She has a high school education and is able to communicate in English.  (Tr. 20.)  She has past relevant work as a state-tested nursing assistant.  (*Id*.)

**B.    Medical Evidence**[2]

On January 12, 2011, Ginley visited her primary care doctor, Mary Klein, M.D., reporting fatigue and chest palpitations.  (Tr. 520.)  She requested a thyroid evaluation.  (*Id*.)  Ginley underwent a lumbar MRI[3] in 2011, which revealed mild degenerative disc disease, a small left paracentral disc protrusion at L2-3 and L5-S1, and displacement of the left S1 nerve root.  (Tr. 539.)

On February 8, 2012, Ginley had a chest x-ray, which revealed healing left rib fractures.  (Tr. 505.)  She saw Dr. Klein the next day, indicating improved rib pain.  (Tr. 336.)

On February 27, 2012, Ginley first saw cardiologist David Martin, M.D.  (Tr. 253.)  She reported repeated falls and dizzy spells several times a week.  (*Id*.)  Dr. Martin noted Ginley had sinus bradycardia, but determined her symptoms were not entirely consistent with syncope.  (Tr. 255.)  He ordered a 30-day heart event recorder to determine the etiology of her symptoms.  (*Id*.)  This event monitor revealed her heart rate ranged from 39 to 119 beats per minute.  (Tr. 339.)

Ginley visited Dr. Klein on March 14, 2012, indicating she had fractured and dislocated one of her toes.  (*Id*.)  She also reported that while she was feeling better after starting a thyroid medication, she was still "twitching" and unable to sit for extended periods.  (Tr. 339, 340.)

---

[2]    The Court notes that its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3]    The exact date of this MRI is not indicated in the cited medical evidence.

3

On October 9, 2012, Ginley first treated with rheumatologist Qingping Yao, M.D.  (Tr. 260.)  She reported fatigue, soreness in her joints, and multiple falls.  (*Id.*)  On examination, she had normal gait, normal spinal range of motion, and no swelling or warmth in her joints.  (Tr. 261.)  Dr. Yao ordered labwork, and encouraged Kinsley to follow up with her cardiologist.  (Tr. 264.)

Ginley returned to Dr. Klein on October 12, 2012, complaining of fatigue and recurrent falls.  (Tr. 342.)  Dr. Klein refilled Ginley's antidepressant and administered a vitamin B12 injection.  (Tr. 343.)  On October 23, 2012, Ginley underwent a bone density scan, which confirmed osteopenia.  (Tr. 268.)

On April 1, 2013, Ginley followed up with Dr. Yao, reporting "burning" in her limbs, and morning stiffness in her joints.  (Tr. 271.)  Dr. Yao noted she was "able to perform normal basic [activities of daily living] without any limitations.  (*Id.*)  Dr. Yao prescribed Lyrica and referred Ginley to neurology for evaluation of her "twitching."  (Tr. 275.)

Ginley then saw neurologist Thomas Gretter, M.D., on April 9, 2013.  She reported "irregular jerking movements," along with fainting and a burning sensation throughout her body.  (Tr. 280.)  She indicated the jerking would last anywhere from a few seconds to a few hours, and worsened with stress and sitting on her right side.  (*Id.*)  She relayed she also had 2-3 episodes of syncope a week, and had to quit her job due to these episodes.  (*Id.*)  On examination, Ginley had "periodic tic-like jerking forward at the hip," a normal gait, normal reflexes, and intact sensation. (Tr. 281.)  Dr. Gretter ordered an EEG and brain MRI in order to evaluate for a possible seizure disorder.  (*Id.*)  The April 29, 2013 brain MRI was stable and unremarkable.  (Tr. 286.)  The May 1, 2013 EEG indicated evidence of "left fronto-temporal epilepsy," but no EEG seizures

4

were recorded. (Tr. 313.)

On June 7, 2013, Ginley saw Dr. Klein and reported she had recently been in the emergency room for gallstones. (Tr. 345.) She relayed her heart rate kept dropping while receiving treatment in the emergency room. (*Id*.)

On July 1, 2013, Ginley consulted with neurologist Norman So, M.D. She reported jerks and spasms for the past 2-3 years. (Tr. 287.) She indicated Lyrica had improved the intensity of these symptoms. (*Id*.) Ginley also described "near blackouts" 2-3 times a week, and "blackouts" once a week. (Tr. 288.) Dr. So noted Ginley had worn a heart rate monitor in the past, and while it revealed bradycardia, it did not indicate loss of consciousness. (*Id*.) He also reviewed her EEG, and concluded the wave forms were non-specific. (Tr. 290.) On examination, she jerked while sitting, but this resolved when she stood up. (*Id*.) Dr. So concluded Ginley did not have a seizure disorder, as her "muscle jerks are not likely of cerebral origin." (*Id*.)

Ginley returned to Dr. Martin, her cardiologist, on July 18, 2013. She indicated she was still falling and losing consciousness for a "couple minutes," at a rate of four episodes a week. (Tr. 294.) Dr. Martin ordered an echocardiogram, a heart monitor, and a tilt table test. (Tr. 296.) Ginley underwent a tilt table test on August 8, 2013, and it was positive for "mixed vasovagal response." (Tr. 301.) She followed up with Dr. Martin on August 12, 2013. He prescribed Midodrine, and encouraged Ginley to increase her salt intake and wear compression stockings. (*Id*.)

Ginley saw Dr. Martin again on September 26, 2013, and reported four syncopal episodes since her last visit. (Tr. 303.) Dr. Martin concluded these episodes were vasovagal in origin, "with a predominant vasodepressor response." (Tr. 305.) Ginley reported she had increased her

5

salt intake, but was only taking a half dose of Midodrine, due to side effects. (*Id.*)

On October 29, 2013, Ginley visited Dr. Klein and reported worsening depression and increased stress. (Tr. 348.) Dr. Klein increased her antidepressant dosage and administered a vitamin B12 injection. (Tr. 349.)

On December 3, 2013, Ginley saw Dr. Yao, reporting improvement in her dizziness and heart rate on Midodrin. (Tr. 402.) However, she still had jerking movements and continued burning pain in her limbs. (Tr. 402, 405.) On examination, Ginley had normal spinal range of motion. (Tr. 403.) She had no swelling or warmth in her hands or feet. (*Id.*) Dr. Yao injected Ginley's right hip with depomedrol and lidocaine and prescribed Lyrica. (Tr. 405.)

Ginley then consulted with spine specialist Eric A.K. Mayer, M.D., on December 27, 2013. (Tr. 408.) She reported right-sided lower back pain, which was radiating down her right side. (*Id.*) She also described burning in her right hip and a jerking sensation in her right leg. (*Id.*) Dr. Mayer determined Ginley's sacroiliac pain was likely related to her mixed connective tissue disease. (*Id.*) On examination, Ginley's ability to single leg sit or stand was impaired and she had tenderness over her right sacroiliac joint, with a limited lumbar range of motion. (Tr. 409.) However, she also had normal gait and adequate neck range of motion. (*Id.*) Dr. Mayer ordered a right sacroiliac joint injection, and suggested to Ginley if she had positive results from this injection, he would refer her for a sacroiliac joint fusion procedure. (*Id.*)

On May 7, 2014, Dr. Klein filled out a "Physical RFC Assessment" prepared by Ginley's attorney. (Tr. 526-527.) Dr. Klein provided the following limitations for Ginley:

- She can lift and carry less than ten pounds on an occasional and frequent basis;

- She can stand/walk for less than 2 hours in an 8-hour workday;

6

- She can sit for less than 2 hours in an 8-hour workday;

- She can sit for 20 minutes, before needing to change position to relieve discomfort;

- She can stand for 5 minutes, before needing to change position to relieve discomfort;

- She requires the opportunity to shift positions at will from sitting or standing/walking;

- She can reach, handle, push, pull, and finger less on a than occasional basis; and

- She will be absent from work more than 3 times a month.

(*Id.*)

Ginley returned to Dr. Yao's office on June 3, 2014, indicating she had experienced relief from her recent injection but continued to have jerking movements and lower back pain.  (Tr. 429.)  On examination, she was jerking frequently, and had difficulty getting on and off of the examination table.  (Tr. 430.)  Dr. Yao referred her for pain management and a physical capacity evaluation.  (Tr. 431.)

On June 10, 2014, Ginley visited Dr. Klein, reporting an increased heart rate, but denying shortness of breath or chest pain.  (Tr. 456.)  Ginley then saw her cardiologist, Dr. Martin, on June 19, 2014.  (Tr. 424.)  Dr. Martin noted recent echocardiograms revealed ejection fractions of 55% and 65%.  (*Id.*)  Ginley reported low blood pressure readings, and daily episodes of rapid heart rate, lightheadedness, and dizziness.  (Tr. 425.)  She denied any syncope.  (*Id.*)  Dr. Martin ordered diagnostic testing and instructed her to return in a month.  (Tr. 426.)

On August 14, 2014, Ginley underwent a functional capacity evaluation with physical therapist Marie Soha, MPT.  (Tr. 528.)  During the examination, Ms. Soha made the following

7

observations:

- Ginley's objective sitting tolerance was 25 minutes, her standing tolerance was 10 minutes, her standing/walking tolerance was 15 minutes, and her walking tolerance was 5 minutes;

- Her stair climbing tolerance was below normal;

- She had poor balance with a single leg stance, but her balance was within the normative data for her age and gender;

- She spent the greatest length of time in the sitting position. However, while sitting, she demonstrated frequent bodily jerking movements, mostly on the left side of her body;

- She "self-limited" during physical tasks;

- She ambulated without an assistive device, and had a short step length.

(Tr. 528-535.)  Based upon this evaluation, Ms. Soha determined Ginley could work at the sedentary physical demand level, "indicating an occasional lift weight of 1.5 [pounds], demonstrating tolerance for lifting at this weight 0-33% of the workday."  (Tr. 528.)  She recommended Ginley enter a chronic pain rehabilitation program, to address her pain, poor mobility, depression, and anxiety.  (Tr. 529.)

On November 5, 2014, pain management physician Hong Shen, M.D., filled out a "Physical RFC Assessment" prepared by Ginley's attorney.  (Tr. 448-449.)  Dr. Shen provided the following limitations for Ginley:

- She can lift and carry less than ten pounds on an occasional and frequent basis;

- She can stand/walk less than 2 hours in an 8-hour workday;

- She has no sitting limitations;

- She can sit for 60 minutes before requiring a change in position to

8

relieve discomfort;

- She can stand for 30 minutes before requiring a change in position to relieve discomfort;

- She will need the opportunity to shift positions at will from sitting or standing/walking;

- She can reach, handle, push, pull, and finger less than occasionally;

- She has no limitations in feeling;

- She will be absent from work more than 3 times a month.

(*Id*.)

On November 25, 2014, Ginley saw nurse practitioner Charlotte Bancho, CNP, in Dr. Martin's office.  (Tr. 547.)  She indicated multiple episodes of near syncope and syncope since her last office visit.  (Tr. 548.)  She reported she had fallen off her porch and broke her right foot in September 2014.  (*Id*.)  Ms. Bancho encouraged Ginley to wear compression stockings, increase her salt intake, and stay hydrated.  (Tr. 549.)

On December 4, 2014, Ginley returned to Dr. Yao's office.  She reported fatigue, joint soreness, and burning in her hips.  (Tr. 537.)  On examination, Ginley had normal gait, but was jerking frequently and had difficulty getting on the examination table.  (Tr. 538.)  She had no swelling or warmth in her joints, but did have some mild tenderness over her right hip.  (Tr. 539.)  Dr. Yao ordered updated labwork, and encouraged Ginley to follow up with a spinal specialist.  (*Id.*)

Ginley returned to Dr. Klein on December 17, 2014, at which time she renewed Ginley's thyroid medication and antidepressant.  (Tr. 578.)

On March 6, 2015, Dr. Yao submitted a letter regarding Ginley, as follows:

9

> Ms. Charmaine Ginley has been under my care for a rheumatic condition and she is unable to attend the jury duty due to the extreme fatigue, muscle weakness, joint pain, confusion, and body jerking.

(Tr. 556.)

Ginley visited the emergency room on April 18, 2015, reporting left rib pain after leaning over a recycling bin. (Tr. 634.) X-rays were negative for any fracture. (Tr. 637.) She was diagnosed with a rib contusion and discharged. (*Id.*) Ginley returned to the emergency room on May 2, 2015, after she had slipped and fell. (Tr. 602.) X-rays revealed a left wrist fracture. (Tr. 599.)

Ginley then saw orthopedist Robert Berkowitz, M.D., on May 4, 2015 for her wrist fracture. Her fingers were moving freely, but were stiff. (Tr. 566.) On May 12, 2015, she indicated her left wrist was clicking and popping. (Tr. 564.) Dr. Berkowitz recommended left wrist surgery to set the fracture. (Tr. 565.) On May 13, 2015, Ginley underwent an open reduction and internal fixation of her left wrist fracture. (Tr. 568.)

On May 25, 2015, Ginley returned to Dr. Berkowitz's office, indicating she was "doing well," but swollen and stiff. (Tr. 562.) She reported continued improvement on June 16, 2015. (Tr. 561.) On August 4, 2015, she indicated no pain in her wrist. (Tr. 558.)

On June 25, 2015, Ginley followed up with Dr. Yao. She indicated fatigue, burning ulcers in her mouth, and mild polyarthralgia. (Tr. 584.) On examination, her gait was steady, but she was again jerking frequently and had difficulty getting on the examination table. (Tr. 585.) Dr. Yao prescribed Leflunomid for her polyarthralgia and fatigue. (Tr. 587.)

**C.** **State Agency Reports**

**1.** **Mental Impairments**

On November 12, 2013, Ginley underwent a consultative psychological examination with Deborah A. Koricke, Ph.D.  (Tr. 382-391.)  She indicated she had been "struggling with significant depressive symptoms since approximately 2008."  (Tr. 385.)  She reported she had been taking Celexa for 4-5 years, but she did not find the medication to be effective.  (*Id*.)  She described a low frustration tolerance, high levels of stress, and crying spells.  (*Id*.)  She also described suicidal thoughts, but denied any attempts or plan.  (*Id*.)  She indicated she preferred not to be around others.  (Tr. 387.)

During the evaluation, she appeared fatigued, frustrated, withdrawn, and depressed.  (Tr. 386.)  She cried during the session, which made it difficult for Dr. Koricke "to engage in conversation at times."  (*Id*.)  She had no difficulty expressing her feelings and her thoughts were coherent and organized.  (*Id*.)  She did exhibit issues with sustained attention, as she needed several questions repeated.  (*Id*.)  Dr. Koricke estimated Ginley's intellectual functioning was in the average range.  (Tr. 387.)  Ginley demonstrated good insight, but was "very vegetative related to her depressive disorder."  (Tr. 388.)

Based upon this evaluation, Dr. Koricke diagnosed Ginley with Major Depressive Disorder, and assigned her a global assessment of functioning ("GAF") score of 55, indicating moderate symptoms.[4]  (Tr. 388.)  With regard to Ginley's functional capabilities, Dr. Koricke

---

[4]       The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of

made the following conclusions:

**1. The claimant's abilities and limitations in understanding, remembering and carrying out instructions.**  Ms. Ginley has no significant difficulty understanding questions or instructions, including complex or multi-step instructions.  She possessed good memory for her history.  She does not show any problems with comprehension and I estimate her IQ level to be in the low average range, consistent with her educational and work history.  While she is likely functioning within the at least low average range of ability, her ability to remember instructions may be negatively affected by her lapses in attention related to her depression.  Her lapses in sustained attention make it difficult for her to fully remember what she has been told.  She would likely have difficulty recalling what needs to be done in the workplace to follow through with completing tasks.  Her lack of attention is viewed as a function of her depressive disorder and physical conditions.  She presents with adequate understanding of real-world systems relevant to the work place.  Vocationally, she did not report any difficulty learning specific job duties while in the workplace.

**2. The claimant's abilities and limitations in maintaining attention and concentration and maintaining persistence and pace to perform tasks and to perform multi-step tasks.**  Charmaine's level of attention/concentration throughout the interview was variable, and she tended to struggle to stay focused at times.  She was able to perform serial 7's slowly, but after a few numbers, she became confused and lost her train of thought.  She completed 4 digits forward and 3 digits backward, indicating mild impairment in sustained concentration.  In sum, she showed attention problems on mental status tasks today and these attention difficulties are seen to be secondary to her emotional issues.  She reports difficulty staying on task at home because of distractibility and lack of persistence due to lack of motivation, poor energy and depressed mood.

**3. The claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**  Although cooperative and polite, Ms. Ginley is depressed and anxious, isolating herself, and feeling inadequate, worthless, and helpless.  Today, Charmaine was cooperative, but was clearly depressed and difficult to engage.  She demonstrated difficulty relating to others during this examination due to her depression.  Overall, she presented as a passive, depressed individual who was rather flat emotionally.

---

clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

She seemed tired, worried, and was emotionally constricted.  Thus rapport was difficult to establish.  Currently, she presents as having limitations in her ability to respond to others in the workplace because of her emotional issues which leave her very withdrawn and depressed.

**4.  The claimant's abilities and limitations in appropriately responding to work pressures in a work setting**.  Ms. Ginley reported that she is struggling with significant depressive symptoms.  When asked to describe her typical mood, she stated that she is withdrawn and depressed, and discussed that she becomes despondent, irritable, and frustrated.  She remains apathetic and socially withdrawn.  Her life stressors include physical conditions and chronic pain, as well as a consistent struggle with her current emotional issues.  When asked about her coping skills, she discussed that she is very vegetative and isolated in her functioning.  She reported very little interest in activities or socializing and stays to herself; often staying in her house and in her bed clothes.  She said that she does very little and doesn't want to be bothered by others.  She rarely does much of anything during the day except light household chores.  She remains depressed on a daily basis.

(Tr. 389-391.)

On December 9, 2013, state agency physician Kristen Haskins, Psy.D., reviewed Ginley's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 75.)  Dr. Haskins found Ginley had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (*Id*.)  Dr. Haskins also completed a Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 79-82.)  Dr. Haskins found Ginley was moderately limited in her abilities to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) sustain an ordinary routine without special supervision; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with co-

13

workers or peers without distracting them or exhibiting behavioral extremes; and (8) respond appropriately to changes in the work setting. (Tr. 80-81.) She found Ginley was not significantly limited in her abilities to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) ask simple questions or request assistance; and (4) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id*.) Dr. Haskins found no evidence of limitation in her abilities to (1) carry out very short and simple instructions; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) work in coordination with or in proximity to others without being distracted by them; (4) make simple work-related decisions; (5) be aware of normal hazards and take appropriate precautions; (6) travel in unfamiliar places or use public transportation; and (7) set realistic goals or make plans independently of others. (*Id*.) She opined Ginley was markedly limited in her ability to interact appropriately with the general public. (Tr. 81.) Dr. Haskins explained the basis of her decision as follows:

> Low average intellectual ability. Her ability to remember instructions initially would be impacted negatively by her lapses in attention and concentration; however, she is able to complete work-related tasks in her daily routine. She denied difficulty learning specific job duties while in the workplace. Can complete simple and a wide variety of multistep not complex tasks.
>
> ***
>
> She demonstrates lapses in sustained attention due to her depressive disorder and physical conditions. She reports distractibility, lack of persistence & motivation, poor energy and depressed mood interfere with her ability to start and finish tasks. She is able to prepare meals. Can complete simple and a wide variety of multistep not complex tasks in a setting that does not need close sustained focus/attention or sustained fast pace.

14

\*\*\*

At present, [claimant] reports no interest in social activities.  Based on responses, she presented adequate social judgment and appears capable of intermittent interaction with coworkers and supervisors.  Should not have primary responsibility for dealing directly with the public, can superficially interact.

\*\*\*

Limited stress tolerance at present.  Although she is less active, she retains the ability to complete routine [activities of daily living] and work-related tasks.  Limited to static tasks.

(Tr. 80-82.)

On March 18, 2014 state agency physician Leslie Rudy, Ph.D. reviewed Ginley's medical records and completed a PRT and Mental RFC assessment.  (Tr. 91, 95-97.)  She affirmed the findings of Dr. Haskins.  (*Id*.)

## 2.        Physical Impairments

On December 19, 2013, state agency physician Lynne Torello, M.D., reviewed Ginley's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 77-79.)  Dr. Torello determined Ginley could lift and carry 20 pounds occasionally, lift and carry 10 pounds frequently, stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 77.)  She further found Ginley could frequently climb ramps/stairs, never climb ladders/ropes/scaffolds, and frequently balance, stoop, kneel, crouch, and crawl.  (Tr. 78.)  She limited Ginley to frequent reaching with the right upper extremity, and no working near unprotected heights, dangerous equipment, or commercial driving.  (Tr. 79.)

On April 23, 2014, state agency physician Maria Congbalay, M.D., reviewed Ginley's medical records and completed a Physical RFC assessment.  (Tr. 93-95.)  She affirmed the

findings of Dr. Torello.  (*Id.*)

**D.      Hearing Testimony**

During the October 9, 2015 hearing, Ginley testified to the following:

- She has her GED.  (Tr. 36.)  She last worked in June 2012 as a state tested nursing assistant ("STNA") at a skilled nursing facility.  (*Id.*)  Her STNA license lapsed in February 2013, because she can no longer perform this type of work. (Tr. 37.)

- She lives with her husband.  (Tr. 34.)  Two of her grandchildren visit daily, for about 45 minutes.  (Tr. 35.)  They will talk with her, eat snacks, and occasionally help her with chores.  (*Id.*)

- She drives twice a week.  (Tr. 36.)  She drives to the post office to mail packages to her son in Alaska.  (*Id.*)

- She cannot work because she cannot lift, is confused, has "tremendous joint pain, and a "twitch."  (Tr. 38.)  She is syncope, and was initially falling daily. (Tr. 39.)  She has now learned to sit or lie down when she feels an episode starting.  (*Id.*)  She recently fell and broke her wrist due to a syncopal episode. (Tr. 51.)

- She has daily joint pain, which flares every 2-3 months.  (Tr. 40.)  The pain is in all of her joints, including her wrists, elbows, and shoulders.  (*Id.*)  During a flare, she takes steroids.  (Tr. 56.)

- She experiences "jerking" while she sits.  (Tr. 41.)  Her doctors have told her it is related to her sciatic nerve.  (*Id.*)  Her doctors have suggested surgery for this, but she has not undergone the procedure due to possible complications from her mixed connective tissue disease.  (Tr. 43.)

- She can sit for about 10 minutes at a time, and stand for 10-15 minutes at a time. (Tr. 42.)  She can walk for about 10 minutes, and then needs to rest for about five minutes.  (*Id.*)  She can lift about 10 pounds.  (*Id.*)

- She has depression, for which she take Celexa.  (Tr. 48.)  She finds this medication helpful, and does not receive any mental health counseling.  (*Id.*)

- She spends most of her days sleeping.  (Tr. 46.)  She will talk on the phone with friends daily, and has a visitor about once a week.  (Tr. 45.)  When her husband comes home from work, she goes outside with him in their garden.  (Tr. 46.) She folds clothes and puts dishes away.  (*Id.*)  She usually does not go grocery

16

shopping.  (*Id.*)

The VE testified Ginley had past work as a nursing assistant (D.O.T. #355.674-014).

(Tr.62.)  The ALJ then posed the following hypothetical question:

> Further assume that the hypothetical individual is limited as follows, to
> light,[5] frequently able to reach overhead and in all over directions with the
> right.  The postural limitations, frequently climb ramps and stairs, never to
> climb ladders and scaffolds.  Frequently balance, stoop, kneel, crouch, and
> crawl.  The environmental limitations, never to be exposed to unprotected
> heights, moving mechanical parts, or operating a motor vehicle.  The mental
> limitations, limited to performing simple, routine, and repetitive tasks, but
> not at a production rate pace, i.e. assembly line work.  Limited to simple
> work-related decisions and using her judgment.  Able to frequently interact
> with supervisors, coworkers and the – pardon me.  Able to frequently interact
> with supervisors and coworkers, but occasionally the public.  And lastly,
> limited to simple work-related decisions in dealing with changes in the work
> setting?

(Tr. 62-63.)

The VE testified the hypothetical individual would not be able to perform Ginley's past

work as an STNA.  (Tr. 63.)  The VE further explained the hypothetical individual would be able

to perform other representative jobs in the economy, such as wire worker (light, unskilled),

electronics worker (light, unskilled), and assembly press operator (light, unskilled).  (Tr. 63-64.)

The ALJ then posed a second hypothetical, which was the same as the first, with the

---

[5]     "Light work" is defined as follows: "Light work involves lifting no more than 20
pounds at a time with frequent lifting or carrying of objects weighing up to 10
pounds. Even though the weight lifted may be very little, a job is in this category
when it requires a good deal of walking or standing, or when it involves sitting
most of the time with some pushing and pulling of arm or leg controls. To be
considered capable of performing a full or wide range of light work, you must
have the ability to do substantially all of these activities." 20 CFR § 404.1567(b).
Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying
requires being on one's feet up to two-thirds of a workday, the full range of light
work requires standing or walking, off or on, for a total of approximately six
hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

17

following changes:

> In my second hypothetical, assume the same limitations I've described in hypothetical number one, but removing the limitations regarding reaching overhead and in all other directions.  Modifying the postural limitations as follows, to occasional climbing of ramps and stairs, balance, stoop, kneel, crouch, and crawl.  But again, never to climb ladders and scaffolds as well as never be exposed to unprotected heights, moving mechanical parts, or operating a motor vehicle.  And also, removing the mental limitations.

(Tr. 65.)  The VE testified the individual could perform the same jobs provided for the first

hypothetical.  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when

she became disabled; and (3) she filed while she was disabled or within twelve months of the

date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of

a five-stage process.  20 C.F.R. §§ 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594

F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the

claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the

time of the disability application.  20 C.F.R. §§ 404.1520(b).  Second, the claimant must show

that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R.

§§ 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Ginley was insured on her alleged disability onset date, June 1, 2012, and remained insured through September 30, 2015, her date last insured ("DLI.")  (Tr. 14.)  Therefore, in order to be entitled to POD and DIB, Ginley must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2015.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq*.).

19

3.    Since the alleged onset date of disability, June 1, 2012, the claimant has had the following severe impairments: postural orthostatic tachycardia syndrome (POTS), lupus, connective tissue disorder, obesity, and depression (20 CFR 404.1520(c)).

4.    Since the alleged onset date of disability, June 1, 2012, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that since June 1, 2012, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations.  The claimant can occasionally climb ramps and stairs.  The claimant can never climb ladders, ropes, or scaffolds.  The claimant can occasionally balance, stoop, kneel, crouch, and crawl.  The claimant can never be exposed to unprotected heights and moving mechanical parts and she cannot operate a motor vehicle.  The claimant can perform simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work).  The claimant is limited to simple work-related decisions in using her judgment and dealing with changes in the work setting.  The claimant can frequently interact with supervisors and co-workers and can occasionally interact with the public.

6.    Since June 1, 2012, the claimant has been unable to perform any past relevant work (20 CFR 404.1565).

7.    Prior to the established disability onset date, the claimant was an individual closely approaching advanced age.  On March **, 2015, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Prior to March **, 2015, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on March **, 2015, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Prior to March **, 2015, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the

national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.   Beginning on March **, 2015, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c) and 404.1566).

12.   The claimant was not disabled prior to March **, 2015, but became disabled on that date and has continued to be disabled through the date of the decision (20 CFR 404.1520(g)).

(Tr. 14-22.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston*

21

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.      Opinion Evidence[6]

Ginley argues the ALJ improperly evaluated the opinion evidence.  (Doc. No. 13 at 13.) She asserts the ALJ "failed to consider the well-supported opinions of [her] treating sources," Drs. Klein and Shen  (*Id.* at 9, 11.)  She notes her rheumatologist, Dr. Yao, provided a letter excusing her from jury duty, and posits while it "may not raise[sic] to the level of an opinion . . . it certainly lends support to the opinions of" Drs. Klein and Shen.  (*Id.* at 12.)  Ginley maintains the ALJ failed to "provide 'good reasons' in his analysis for not granting these treating source opinions controlling weight."  (*Id.* at 14.)  Finally, Ginley takes issue with the ALJ's decision to grant more weight to the state agency physicians, arguing they "never had the benefit of actually examining" her, and noting one of the state agency physician's area of practice "hardly makes [her] more qualified to render an opinion in this matter than [her] treating sources."  (*Id.* at 15.)

The Commissioner maintains "the ALJ properly weighed the medical opinions in the record."  (Doc. No. 15 at 10.)  She suggests Dr. Klein may not be considered a treating physician, as she "only saw Plaintiff five times in the two and a half years before providing the opinion."

---

[6]      The Court notes while Ginley only indicated one assignment of error, a close reading of her brief reveals she actually advances two assignments of error: 1) "the ALJ erred by failing to provide an appropriate analysis of the opinion evidence" and 2) "the ALJ failed to properly evaluate her credibility."  (Doc. No. 13 at 7, 8.)

(*Id*. at 14.) She further argues Dr. Klein relied on a functional capacity evaluation for her opinion, but "the evaluation does not provide support for the limitations because the test reliability and Plaintiff's effort was only 'fair.'" (*Id*. at 13.) As for Dr. Shen's opinion, the Commissioner asserts "the ALJ properly gave the opinion little weight because the doctor had provided no treatment notes or explanation for the limitations." (*Id.*)

With regards to Dr. Yao's letter, the Commissioner maintains since Dr. Yao did not provide any functional limitations for Ginley, "remanding the case for the ALJ to identify the weight given to the statement would serve no purpose." (*Id.* at 14.) Finally, the Commissioner submits the ALJ could rely on the opinions of the state agency physicians, and "while their specialization does not entitle their opinions to greater weight, it does not support Plaintiff's contention that the ALJ should have given their opinions less weight." (*Id.* at 12.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'" *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight." *Id.* "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), id. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), id. § 404.1502, 404.1527(c)(2)." *Id.* In other words, "[t]he regulations provide progressively more

24

rigorous tests for weighing opinions as the ties between the source of the opinion and the

individual become weaker."  Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec.

Admin. July 2, 1996).[7]

      A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is

not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of*

*Soc. Sec*., 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[8]  However, "a finding

that a treating source medical opinion . . . is inconsistent with the other substantial evidence in

the case record means only that the opinion is not entitled to 'controlling weight,' not that the

opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).

Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed

using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at

408.[9]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source

opinion controlling weight, then the opinion is weighed based on the length, frequency, nature,

---

[7]    SSR 96-6p was rescinded on March 27, 2017, but was in effect at the time of
Ginley's administrative hearing.  *See* SSR 17-2p, 2017 WL 3928306 at *1 (Soc.
Sec. Admin. Mar. 27, 2017).

[8]    Revised versions of these regulations took effect on March 27, 2017 and apply to
disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27,
2017).

[9]    Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to
a treating physician's opinion, the Commissioner should consider the length of the
relationship and frequency of examination, the nature and extent of the treatment
relationship, how well-supported the opinion is by medical signs and laboratory
findings, its consistency with the record as a whole, the treating source's
specialization, the source's familiarity with the Social Security program and
understanding of its evidentiary requirements, and the extent to which the source
is familiar with other information in the case record relevant to the decision.

25

and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406. Moreover, the "treating physician rule" only applies to *medical opinions*. "If the

26

treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec*., 535 Fed. App'x 498, 505 (6th Cir. 2013). The opinion, however, "is not entitled to any particular weight." *Turner*, 381 Fed. App'x at 493. *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

Moreover, an ALJ must consider the findings and opinions of the stage agency medical consultants, because the "Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. §404.1513a(b)(1).  When doing so, an ALJ will evaluate the findings using the relevant factors in §§ 404.1520b, 404.1520c and 404.1527, such as the consultant's medical specialty and expertise, the supporting evidence in the case record, consistency of the consultant's opinion with evidence from other sources in the record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions.  20 C.F.R. § 404.1513a(b)(2).  Finally, an ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant unless a treating physician's opinion has been accorded controlling weight.  *See* 20 C.F.R § 404.1527(e).

### Dr. Klein

The ALJ weighed the opinion evidence from Dr. Klein as follows:

A physical residual functional capacity assessment was completed by Mary Klein, M.D., in August 2014, which stated that the claimant could lift and carry less than 10 pounds occasionally, stand and/or walk and sit for less than 2 hours each in an 8-hour day, can sit for 20 minutes before changing positions, stand for 5 minutes before changing positions, needs the opportunity to shift positions at will, can less than occasionally reach,

handle, finger, push, and pull, and would be absent from work more than three times per month due to her impairments or treatment (9F/2-3).  The undersigned assigns this opinion some weight, as it is accompanied by detailed examination notes; however, the medical evidence of record as a whole, discussed further above, does not support such extreme limitations.

(Tr. 19.)

As an initial matter, the Court notes the Commissioner questions Dr. Klein's status as a treating physician, noting Dr. Klein "only saw Plaintiff five times in the two and a half years before providing the opinion."  (Doc. No. 15 at 14.)  The Court rejects this argument, and finds Dr. Klein does qualify as a treating physician.  A treating source must have "an ongoing treatment relationship with" the claimant, and the frequency of treatment must be "consistent with accepted medical practice" for the claimant's condition.  20 C.F.R. §§ 404.1527(a)(2).  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 273 (6th Cir. July 13, 2015).  Precedent in this Circuit suggests a physician who treats an individual only twice or three times may not constitute a treating source.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496,  506–07 (6th Cir. 2006) ("Depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship"); *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. App'x 625, 629 (6th Cir. 2016); *Mireles ex rel. S.M.M. v. Comm'r of Soc. Sec.*, 608 Fed. App'x 397, 398 (6th Cir. 2015);  *Helm v. Comm'r of Soc. Sec. Admin.*, 405 Fed. App'x 997, 1000–01 n. 3 (6th Cir. 2011.)  *See also Fleischer*, 774 F.Supp.2d 875, 879 (N.D. Ohio 2011); *Pethers v. Comm'r of Soc. Sec.*, 580 F.Supp.2d 572, 579 n .16 (W.D. Mich. 2008); *Carter v. Berryhill*, 2017 WL 2544064 at * 9 (N.D. Ohio May 26, 2017); *Witnik v. Colvin*, 2015 WL 691329 at * 7 (N.D. Ohio Feb. 18, 2015); *Hickman v. Colvin*, 2014 WL 2765670 at * 12 (M.D. Tenn. June 18, 2014).

The Commissioner cites to *Rudd v. Commissioner of Social Security,* 531 Fed. App'x 719 (6th Cir. 2013) in support of the argument Dr. Klein is not a treating physician.  However, in *Rudd,* the doctor had only seen the claimant four times over a two year period, and did not provide an opinion regarding the claimant's limitations until nearly a year after the most recent visit.  *Rudd,* 531 Fed. App'x at 729.  Here, Dr. Klein has been treating Ginley since at least 2011, examined Ginley at least six times prior to rendering her May 2014 opinion, and continued to see Ginley on a regular basis both before and after the opinion.  (Tr. 520, 336, 339, 342, 345, 348, 456, 578.)  Thus, the Court concludes Dr. Klein constitutes a treating physician for purposes of evaluating opinion evidence.

The Court finds the ALJ failed to properly evaluate Dr. Klein's opinion.  As noted above, the ALJ must provide "good reasons" for the weight assigned, and articulate those reasons in order to allow for meaningful appellate review.  Here, the ALJ did not comply with these requirements.  The ALJ provided the conclusory statement the opinion "is accompanied by detailed examination notes; however, the medical evidence of record as a whole, discussed further above, does not support such extreme limitations." (Tr. 19.)  The entirety of the medical evidence discussion referenced by the ALJ in this statement is as follows:

> Regarding the claimant's lupus and connective tissue disorder, the claimant has been diagnosed with lupus, syncope, and connective tissue disease (2F/27, 57).  The claimant had a positive ANA test in January 2011 (2F).  The claimant has consistently complained of symptoms including joint pain, rash, burning, and tingling (2F/39).  The claimant additionally has been diagnosed with and treated for POTS (10F/4).  The claimant was advised to increase her salt intake, use compression stockings, and take fludrocortisone (10F/4).  However, despite these diagnoses and symptoms, the claimant was consistently observed to be in no acute distress (3F/7, 10, 13, 16, 19; 5F/17; 6F/20; 8F/7, 29, 29, 43, 46, 49, 58, 65, 69, 71, 73; 10F/14, 18) and was noted to be alert and oriented (2F/13, 24, 41; 3F/7, 10, 13, 16, 19; 5F/11; 6F/15; 8F/7, 29, 29, 43, 46, 49, 58, 65, 69, 71, 73).  In

> April 2012, David Martin, M.D., noted that the claimant did not have any
> arrythmias other than occasional sinus bradycardia (2F/10).  Additionally,
> it was noted in October 2012 and June 2015 that the claimant could
> perform her basic activities of daily living without limitation.  (2F/12;
> 14F/2).

(Tr. 18.)  The ALJ did not provide any further discussion of the medical evidence of record under

step four, nor does he explain exactly which findings are incompatible with the limitations

provided by Dr. Klein.  Moreover, the ALJ does not even acknowledge or address several key

pieces of evidence in the decision.  For example, in her opinion, Dr. Klein indicated she based a

portion of the limitations on an August 2014 functional capacity evaluation.  (Tr. 527 – 535.)

The ALJ does not reference this evaluation at any point in his decision, despite the fact it is the

very objective evidence upon which Dr. Klein's opinion is based.

Furthermore, substantial evidence does not support the ALJ's conclusion the "extreme"

limitations provided by Dr. Klein are unsupported by the medical evidence of record.  In his

minimal discussion of the medical evidence, the ALJ references several treatment notes

indicating Ginley was "consistently observed to be in no acute distress" and "alert and oriented."

(Tr. 18.)  However, within many of these same treatment notes, her doctors noted recurrent falls,

fatigue, low heart rate, and a "jerking" movement.  (Tr. 342, 345, 402, 408, 434, 429, 430.)

These treatment notes further indicate Ginley (1) experienced daily episodes of lightheadedness,

dizziness, and rapid heart rate with increased blood pressure; and (2) fractured bones due to

recurrent falls.  (Tr. 425. 537, 602.)  An August 8, 2013 tilt table test was positive for a mixed

vasovagal response, objective evidence which the ALJ fails to analyze or discuss in the decision.

(Tr. 301.)  During an August 14, 2014 functional capacity evaluation, the examining physical

therapist concluded she would be limited to sedentary work.  (Tr. 528.)

30

The ALJ does not sufficiently explain how, in light of the above evidence, "the medical evidence of record" supports affording Dr. Klein's opinion only "some" weight.  The Sixth Circuit has made clear that an ALJ's conclusory and unexplained statement a treating physician opinion is inconsistent with the medical evidence of record, does not constitute a "good reason" for purposes of a rejecting an opinion.  *See, e.g., Friend v. Comm'r of Soc. Sec.,* 375 Fed. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 245–46 (6th Cir. 2007) (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Bartolome v. Comm'r of Soc. Sec.,* 2011 WL 5920928 (W.D. Mich. Nov.28, 2011) (noting that merely citing to "the evidence" and referring to the appropriate regulation was insufficient to satisfy the "good reasons" requirement); *Patterson v. Astrue,* 2010 WL 2232309 (N.D.Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance.").

Had the ALJ provided a more detailed discussion of the treatment notes prior to weighing Dr. Klein's opinion, this Court may have been able to conduct a meaningful appellate review.  However, the ALJ did not provide a comprehensive discussion of the evidence, and in fact, ignored several important pieces of medical evidence (i.e., the tilt table test and functional

capacity evaluation) and failed to recognize or address portions of Ginley's treatment notes that do not support his conclusion.  The ALJ cannot cure a deficient explanation by simply reciting some of the evidence, and then follow it with an unexplained conclusion the treating source opinion is inconsistent with the evidence.  *Boughter v. Colvin,* 2016 WL 7670046 at \*19 (N.D. Ohio Dec. 12, 2016).  *See also Sacks v. Colvin*, 2016 WL 1085381 at \* 5 (S.D. Ohio March 21, 2016) ("[A]lthough the ALJ made a general statement about inconsistencies between Dr. Bhatia's opinions and the 'medical evidence of record,' it was just that-a general statement devoid of any specific reference to any portion of the medical evidence. Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ correctly or incorrectly assessed those claimed inconsistencies.").

The Commissioner attempts to justify the ALJ's weighing of Dr. Klein's opinion by evaluating the objective evidence in her brief.  Specifically, the Commissioner discusses Ginley's poor effort and cooperation during her functional capacity evaluation.  (Doc. No. 15 at 13.)  She explains this evaluation, along with Dr. Klein's treatment notes, and the lumbar MRI, do "not support the extreme limitations."  (*Id*. at 13, 14.)  While these may be perfectly reasonable explanations for ascribing less weight to a treating source opinion, the ALJ did not articulate them in the decision.  The Commissioner cannot attempt to cure a deficient opinion by offering explanations never offered by the ALJ.  As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn v. Colvin*, 2013 WL 3967282 at \* 8 (N.D. Ohio July 31,

2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).

In sum, the ALJ's decision fails to set forth good reasons for discounting the opinion of Dr. Klein. Moreover, this portion of the decision is so conclusory and devoid of any explanation that it deprives this Court the ability to conduct a meaningful review. Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to sufficiently address the limitations assessed by Dr. Klein.

### Dr. Shen

The ALJ weighed the opinion evidence from Dr. Shen as follows:

> A physical residual functional capacity assessment was completed by Hong Shen, M.D., in November 2014, which stated that the claimant could lift and carry less than 10 pounds occasionally, stand and/or walk for less than 2 hours in an 8-hour day, can sit for an hour before changing positions, stand for 30 minutes before changing positions, needs the opportunity to shift positions at will, can occasionally reach, handle, finger, push, and pull, and would be absent from work more than three times per month due to her impairments or treatment (7F/3-4). The undersigned assigns this opinion little weight, as these extreme limitations are not accommodated by a detailed explanation or treatment notes.

(Tr. 18-19.)

The Court finds the ALJ properly weighed Dr. Shen's opinion. Ginley asserts she has been receiving pain management from Dr. Shen since August 2014. (Doc. No. 13 at 11.) However, a review of the evidence indicates no treatment notes from Dr. Shen. The only evidence from Dr. Shen is a two page physical RFC assessment. (Tr. 448-449.) During the hearing, Ginley's counsel inquired as to Ginley's treatment course with Dr. Shen, and Ginley responded she had "only seen her a few times." (Tr. 59.) Ginley has provided no explanation for this lack of treatment documentation, nor has she clarified the frequency with which she has

33

seen Dr Shen.

Based upon this testimony and lack of evidence, the Court cannot ascertain whether Dr. Shen qualifies as a "treating physician" for purposes of weighing opinion evidence. Furthermore, in his decision, the ALJ did not refer to Dr. Shen as a treating physician, and specifically noted the limitations were not accompanied by any explanation or treatment notes. (Tr. 19.)  Thus, the Court finds the ALJ was not required to provide "good reasons" for discounting Dr. Shen's opinion, and further finds the explanation provided was sufficient.

### Dr. Yao

The ALJ discussed the letter provided by Dr. Yao as follows:

In March 2015, Qingping Yao, M.D., wrote in a letter that the claimant could not attend jury duty due to extreme fatigue, muscle weakness, joint pain, confusion, and body jerking (11F/2).

(Tr. 19.)

The Court finds the ALJ did not err in his treatment of Dr. Yao's conclusions.  This letter is simply a statement that Ginley is not able to attend jury duty, and offers no specific functional limitations.  (Tr. 556.)  Thus, these conclusions are not opinions of a medical condition.  *See Griffith v. Comm'r of Soc. Sec.,* 2017 WL 6558656, n.4 (N.D. Ohio Nov. 28, 2017) (finding a two-sentence letter excusing claimant from jury duty did not qualify as an opinion).  The ALJ considered and acknowledged this letter in his decision.  As the "good reasons" requirement does not apply here, this is all which was required of the ALJ.

The Court notes Ginley is not arguing this statement should be construed as a "medical opinion," but rather, adds further support to the opinions of Drs. Klein and Shen.  (Doc. No. 13 at 12.)  Regardless, it is not the Court's role to reconsider facts or re-weigh the evidence.

34

*Reynolds v. Comm'r of Soc. Sec*., 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing

*Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  Moreover, the

Court notes the ALJ determined Ginley was disabled on March 24, 2015, just a few weeks

following Dr. Yao's letter.  It is clear the ALJ considered this letter when reaching his findings.

> ### State Agency Physicians[10]
>
> The ALJ weighed the opinions of the state agency physicians as follows:
>
> State agency medical consultants Lynne Torello, M.D., and Maria
> Congbalay, M.D., opined the claimant could perform light work; never
> climb ladders, ropes, or scaffolds; frequently climb ramps and stairs,
> balance, stoop, kneel, crouch, and crawl; has limited overhead, front, and
> lateral reaching to the right side; and cannot work around unprotected
> heights, dangerous equipment, and cannot perform commercial driving
> (1A, 3A).  The undersigned assigns this opinion great weight, as it is
> consistent with the medical evidence of record as a whole, discussed
> further above.

(Tr. 19.)

Ginley is arguing the ALJ erred in granting "the most weight to two non-examining

physicians," while rejecting the "well-supported, reliable and compelling opinions" of her

treating sources.  (Doc. No. 13 at 15.)  She notes Dr. Torello's opinion was from 2013, and

therefore, "did not have the benefit of reviewing most of the medical evidence."  (*Id*.)  As for Dr.

Congbalay, Ginley notes she is a "board certified clinical pathologist," which "hardly makes

[her] more qualified to render an opinion [than her treating physicians], who actually routinely

treat patients with various diseases and conditions."  (*Id*.)

As an initial matter, the Court notes that, regardless of Ginley's arguments, the ALJ is

---

[10]     The Court notes Ginley does not raise any arguments regarding the ALJ's
treatment of the state agency physicians' conclusions regarding her mental
limitations.

charged with considering the findings and opinions of the state agency medical consultants, because the "Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. §404.1513a(b)(1). Nonetheless, the Court declines to evaluate the ALJ's weighing of the state agency opinions, as the ALJ's consideration of Dr. Klein's opinion on remand may alter his evaluation of the state agency physicians' conclusions.

In sum, the Court finds the ALJ erred in his treatment of Dr. Klein's opinion. While there may be good reasons to reject portions of Dr. Klein's opinion, the ALJ failed to sufficiently articulate those reasons in order to allow for meaningful appellate review. Thus, the decision should be vacated and this matter further remanded for further consideration of Dr. Klein's opinion.

**B.      Credibility**

Ginley next argues the "ALJ's decision is devoid of any analysis of [her] credibility." (Doc. No. 13. at 17.) She asserts the "credibility analysis provided by the ALJ is not specific," and thus, not in compliance with Social Security Ruling 16-3p. (*Id*.) Ginley maintains the few statements the ALJ does provide "are in contrast to the rest of the record, particularly the objective findings" and the statement provided by Dr. Yao, excusing her from jury duty. (*Id*.)

The Commissioner asserts the "ALJ properly found Plaintiff's allegations inconsistent with the record as a whole, including the medical opinions, the medical evidence, and her daily activities." (Doc. No. 15 at 10.) She maintains the ALJ's consideration of Ginley's subjective complaints complied with the relevant regulations. (*Id*.) The Commissioner argues the ALJ identified the inconsistencies in the record, and "properly considered the inconsistent

36

descriptions of Plaintiff's daily activities."  (*Id.* at 15, 16.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs*., 667 F.2d 524, 538 (6th Cir. 1981), cert. denied, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 96–7p, 1996 WL 374186 (July 2, 1996) and SSR 16-3p, 2016 WL 1119029 (March 16, 2016).[11]  Essentially, the

---

[11]     SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016, so it was not in effect at the time of the October 9, 2015 hearing.  Ginley suggests in her brief SSR 16-3p governs this case, while the Commissioner does not address this issue.  This Court has previously decided, in dicta, to apply SSR 16-3p retroactively.  *See e.g., Anderson v. Berryhill*, 2017 WL 1326437 at fn 3 (N.D. Ohio March 2, 2017).  Here, although the issue is raised, the parties do not fully address SSR 16-3p's application.  District courts within this Circuit have disagreed regarding the retroactivity of SSR 16-3p and the Sixth Circuit has not decided the issue. *See Sypolt v. Berryhill*, 2017 WL 1169706 at fn 4 (N.D. Ohio March 8, 2017) (applying SSR 16-3p retroactively); *Clayton v. Comm'r of Soc. Sec.*, 2016 WL 5402963 at * 6 (E.D. Mich. Sept. 28, 2016) (applying SSR 16-3p but not directly addressing issue of retroactivity); *Carpenter v. Comm'r of Soc. Sec.*, 2017 WL 1038913 at * 11 (N.D. Ohio March 17, 2017) (applying SSR 16-3p but not directly addressing issue of retroactivity).  *But see Murphy v. Comm'r of Soc. Sec.*, 2016 WL 2901746, at n. 6(E.D. Tenn. May 18, 2016) (declining to apply SSR 16-3p retroactively); *Withrow v. Comm'r of Soc. Sec.*, 2016 WL 4361175 at fn 5 (S.D. Ohio Aug. 16, 2016) (same); *Richards v. Comm'r of Soc. Sec.*, 2017 WL 892345 at fn 5 (E.D. Mich. Feb. 16, 2017); *Davis v. Astrue*, 2016 WL 5957616 at fn 2 (W.D. Tenn. Oct. 14, 2016) (same); *Baker v. Comm'r of Soc. Sec.*, 2016 WL 4361174 at fn 2 (S.D. Ohio Aug. 16, 2016); *Scott*

same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.,* 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision

---

*v. Berryhill,* 2017 WL 875480 at fn 7 (E.D. Ky. March 3, 2017). The Sixth Circuit, while declining to reach the retroactivity issue, has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' " *Dooley v. Comm'r of Soc. Sec*., 656 Fed. Appx. 113, 119 n.1 (6th Cir. 2016). The Court perceives the issue to be largely academic here; Ginley makes no argument that applying SSR 16-3p over SSR 96-7p would change the outcome. As discussed above, the ALJ evaluated Ginley's complaints against the objective medical evidence and did not judge Ginley's character. In any event, the Court's evaluation of Ginley's credibility argument herein would be the same applying either SSR 16-3p or SSR 96-7p.

must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96–7p, Purpose Section, 1996 WL 374186 (July 2, 1996)[12]; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To determine credibility or the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §404.1529; SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996); SSR 16-3p, Purpose, 2016 WL 1119029  (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[13]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp.2d at 733; *Masch v.*

---

[12]  SSR 16-3p similarly provides the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."

[13]  The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec*., 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

*Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Reading the decision as a whole, the Court finds the ALJ properly evaluated Ginley's credibility.  The ALJ thoroughly examined Ginley's hearing testimony and written statements regarding her symptoms, treatment, and daily activities.  (Tr. 15-18.)  For example, at step two, the ALJ noted Ginley complained of back and wrist pain, but diagnostic testing of Ginley's spine revealed mild findings, and her wrist fracture was healing well.  (Tr. 15.)  At step three, the ALJ provided a detailed discussion of Ginley's reported daily activities, social skills, and performance during the psychological consultative examination.  (Tr. 16.)  He specifically noted Ginley herself had reported she "prepares simple meals, does light housework, can go out alone, can drive, shop in stores, and can handle finances."  (*Id*.)  At step four, the ALJ provided a three-paragraph discussion of her reported daily activities and symptoms.  (Tr. 17-18.)  He discussed Ginley's testimony regarding frequent falls and pain flares, acknowledged her testimony she can "sit for 10 minutes, stand for 10 to 15 minutes, walk for 10 minutes, and lift up to 10 pounds." (Tr. 18.)

After considering the above evidence, the ALJ determined Ginley's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, however, the ALJ found her statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (*Id*.)  The ALJ then discussed Ginley's treatment notes, her body mass index, the three opinions from her doctors, and the psychological consultative examination.  (Tr. 18-19).  The ALJ then noted the following:

> Regarding the claimant's credibility, the claimant's alleged difficulties with
> balance and walking are supported by emergency room department records

40

detailing a sprained ankle and broken hand (15F).  However, it was noted in
October 2012 and June 2015 that the claimant could perform her basic
activities of daily living without limitation (2F/12; 14F/2), despite the
claimant's allegations that her family members perform all of the household
chores.

(Tr. 20.)

Ginley argues the only credibility analysis in the entirety of the decision is this one

paragraph.  The Court rejects this argument.  Despite Ginley's contention the ALJ only provided

this "conclusory statement citing a few vague findings in the record," the above review of the

decision indicates credibility analysis throughout.  (Doc. No. 13 at 17.)  Indeed, while this is the

only paragraph starting with the phrase "regarding the claimant's credibility," the decision also

considered her treatment, her diagnoses, her allegations, objective findings upon examination,

diagnostic testing, and reported daily activities, all of which are relevant factors when conducted

a credibility analysis.  *See* SSR 16-3p, 2016 WL 1119029 at * 7.

In addition, the ALJ openly acknowledged the objective findings which indicated

Ginley had some limitations.  He noted her consistent report of symptoms, her positive ANA

testing, as well as the impact her obesity would have on her residual functional capacity.  (Tr.

18.)  Then, in formulating Ginley's RFC, the ALJ accommodated her various limitations by

restricting her to light work, and imposing rather significant environmental limitations to account

for her syncope.

Substantial evidence supports the ALJ's credibility determination.  As the ALJ correctly

noted, Dr. Klein repeatedly noted Ginley was in no acute distress during examinations, and Dr.

Yao noted at each office visit Ginley was able to perform her activities of daily living without

limitation.  (Tr. 260, 271, 402, 584.)  Moreover, Dr. Yao also frequently noted Ginley's normal

gait, normal spinal range of motion, and a lack of swelling or warmth in her joints. (Tr. 261, 272, 403, 585.) Her EEG testing was negative for any seizure activity, and her brain MRI was unremarkable. (Tr. 286, 313.) Despite her reports of repeated falls and syncope, she does not use a cane and continues to drive. (Tr. 39, 227.) While Ginley testified she depends upon her husband and grandchildren to manage the household chores, she also reported she cooks simple meals, does light housework, shops in stores, and manages her personal finances. (Tr. 39, 44, 226, 227.)

While Ginley urges the Court to reject the reasons provided by the ALJ in determining the "intensity, persistence, and limiting effects of an individual's symptoms," it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec*., 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")

In sum, the ALJ considered a number of factors in assessing Ginley's credibility, including her treatment course, the objective findings upon examination, and her daily activities. These factors are supported by the evidence in the record and are sufficiently specific to make the basis of the ALJ's credibility analysis clear.

Accordingly, the Court finds substantial evidence supports the ALJ's credibility assessment. This assignment of error is without merit.

42

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be VACATED and the case REMANDED for further proceedings consistent with

this decision.


                                                    *s/Jonathan D. Greenberg*
                                                    Jonathan D. Greenberg
                                                    United States Magistrate Judge

Date:  January 31, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**